HILLER et al. v. LADD et al.

(Circuit Court, D. Oregon. April 16, 1897.)

1. TRUSTS—SALE OF STOCK—AUTHORITY FROM PROBATE COURT.
   When stock has been transferred by the owner to a trustee for the purpose of enabling a sale of it to be made, with the stock of other parties, to good advantage, it is not necessary that a sale of such stock, made by the trustee after the death of the owner, should be authorized by the probate court, under the provisions of the California statute.

2. EQUITY JURISDICTION—CONSENT DECREE OF PROBATE COURT.
   A court of equity has no jurisdiction to set aside a stipulation of parties pursuant to which a decree of distribution of the estate of a deceased person has been made by a probate court, nor to cancel, set aside, or modify such decree, nor to compel an account for what has been received under such distribution, which would, in effect, set aside the decree by indirection.

3. ACCOUNTING—EVIDENCE.
   Upon an examination of the evidence as to the dealings between the parties in this case, *held*, that the complainant established no right to an accounting by the defendants.

Philip D. Galpin and J. B. Cleland, for plaintiffs.
C. E. S. Wood, C. A. Dolph, and T. C. Dutro, for defendants.

BELLINGER, District Judge. This is a suit in equity for an accounting. J. W. Ladd died on the 28th of February, 1871, leaving a widow, the complainant, Sarah F. Hiller, with whom is joined as complainant her present husband, D. Albert Hiller. J. W. Ladd, at the time of his death and for many years prior thereto, resided in San Francisco, Cal., where he was engaged in different enterprises of a speculative character, in many of which he was associated with his brother, W. S. Ladd, of Portland, Or. The latter died on January 14, 1893, leaving a large estate, which was disposed of by will in which the respondents herein were named as executors. Among the enterprises in which J. W. and W. S. Ladd were interested was that of the Oregon Steam Navigation Company, an Oregon corporation, which company they, with a number of other persons, controlled and directed. At the death of J. W. Ladd he was the owner of 7,600 shares in the stock of said company, standing in the name of Alvinza Hayward, of San Francisco, Cal. In his last will, J. W. Ladd expressed the utmost confidence in the ability and integrity of his brother, W. S. Ladd, in whose hands he requested his wife to place her property and estate, to manage and invest for her. The will also contained the following clause: "It is my desire and request that the property acquired before my marriage be considered and treated as community, and not as separate, property." Upon probate of this will, W. S. Ladd, J. M. French, and the complainant, now Sarah F. Hiller, were appointed executors of J. W. Ladd's estate.

It is alleged, in effect, that complainant was ignorant of her husband's business, and permitted W. S. Ladd, as executor, to have exclusive control of her husband's estate; that he procured an instrument of trust in his favor, under which he took possession, management, and control of all her property and business; that he fraudulently, and by means of threats of expensive litigation, induced her to sign an agreement by which the will of J. W. Ladd was construed

to give her but one-half of the entire estate, including her community property, instead of one-half of the residue, excluding such property, and that he procured a decree of distribution in accordance with such agreement during her absence in Europe; that he fraudulently omitted from the inventory of J. W. Ladd's estate 7,600 shares of the stock of the Oregon Steam Navigation Company, belonging to it, and standing in the name of Alvinza Hayward, and concealed such ownership from her, except as to 950 shares, which he falsely pretended he had purchased from C. E. Tilton for $33,250; that on April 2, 1872, J. W. Ladd being then dead, three-fourths of the stock of the company was sold to the Northern Pacific Railroad Company, at 40 cents on the dollar, one-half in cash and the balance in bonds of the railroad at 90 cents of their par value; that the estate of J. W. Ladd was represented at this sale by W. S. Ladd, yet he did not in fact deliver any of the 7,600 shares belonging to the estate until the panic of 1873, when, the Northern Pacific Railroad Company having become insolvent, and its bonds valueless, he craftily attempted to substitute the stock of the estate for his own stock, delivered on the sale, and contrived entries in the books of Mrs. Hiller, kept by him, by which the estate's ownership of the 7,600 shares was concealed, and it was made to appear that the 950 shares were purchased from C. E. Tilton at an expense to the estate of $33,250; that he deceived her as to the terms of the sale of the 950 shares, which was made to Henry Villard in 1879, with the stock of the other owners, and falsely represented that such sale was for $50 per share, and no more, although in fact the price paid included an additional $50 per share in stocks and bonds; that W. S. Ladd subsequently admitted this deception, and delivered the stocks and bonds to which complainant was entitled; that the fraudulent scheme of W. S. Ladd was not discovered by her until 1893; that it was known, when J. W. Ladd died, that he left a large estate, and W. S. Ladd did not dare to omit said 7,600 shares of stock from the inventory of the estate without substituting other values therefor, and he therefore substituted a pretended promissory note of Alvinza Hayward, for $190,000, dated March 1, 1870, but upon which no payments of interest had been made, thereby pretending that such a note had been given as for a purchase of said stock; that all this was untrue, and was fraudulently planned by W. S. Ladd to conceal the estate's ownership of such stock; that from time to time, while the estate was being administered, W. S. Ladd received dividends on the stock so concealed, which he credited on the note as payments of interest thereon, although in fact no such note was made by Hayward, and no interest was ever paid on account of it. And the complainant further alleges that, shortly after the failure of Jay Cooke, a syndicate was formed to repurchase the stock so sold to said Jay Cooke, in which syndicate were represented W. S. Ladd, S. G. Reed, R. R. Thompson, J. C. Ainsworth, and C. E. Tilton, and at the time of the failure of said Jay Cooke, which took place on the 17th day of September, 1873, the said W. S. Ladd, R. R. Thompson, J. C. Ainsworth, S. G. Reed, and C. E. Tilton were either directors of, or controlled the directors of, said Oregon Steam Navigation Company, and that they so managed or caused the affairs

of said corporation to be so managed that, in the year 1874, by withholding dividends, the value of its stock was greatly reduced, and the syndicate purchased and divided into six equal parts 26,548 shares, at an average price of $13 per share; that one of the parts or interests was on account of the estate of J. W. Ladd, and was taken in the name of E. Quackenbush or J. C. Ainsworth, trustee; that, if it was true, as W. S. Ladd falsely pretended, that complainant's stock was sold to Jay Cooke, then it became his duty to buy back said stock for complainant upon the same terms on which he bought back stock for himself, for which purpose he had sufficient means belonging to complainant; that, on said stock so purchased for said complainant as aforesaid by said syndicate, said W. S. Ladd received all the dividends which were declared thereon from and after the date of said repurchase down to the time of the sale of said stock to said Henry Villard, and that said dividends amounted to the sum of about $53,698; that on the 23d of May, 1879, said syndicate sold to Henry Villard said shares of said stock, for which said Villard paid 50 per cent. of the par value thereof in cash, less a small sum reserved to pay prior debts of said corporation, and the other 50 per cent. in stocks and bonds taken at the par value thereof; that the profits of the estate of J. W. Ladd on the purchase and sale of said shares of stock so bought and sold for the benefit of said estate were about $384,888, besides the dividends which accrued on said stocks from the time of said purchase to the date of the sale to said Henry Villard, with interest on bonds, and dividends and premiums on each received on Villard sale, with interest on the same, which amounted to $974,334; and the profits on the three-fourths thereof belonging to said complainant is about $959,417, all of which came into the hands of said W. S. Ladd, and thereafter into the hands of these defendants, and have never been accounted for to said complainant.

The charge, made in the bill of complaint, to the effect that in the sale of stock held by Hayward to Jay Cooke, for the Northern Pacific Railroad Company, none of the 7,600 shares belonging to the estate of J. W. Ladd was delivered, but that such stock was retained until the panic of 1873, when, the Northern Pacific Railroad Company and Jay Cooke having become insolvent, W. S. Ladd craftily substituted or attempted to substitute the stock of the estate in lieu of his own stock sold to Jay Cooke, and contrived entries in Mrs. Hiller's books to that end, is not supported by any evidence in the case; but, on the contrary, these charges are conclusively disproved. It is, in effect, conceded to be the fact that the estate of J. W. Ladd was represented in that sale, and shared in whatever benefits accrued to it equally with all the other parties concerned, and it is beyond dispute that, in that sale, W. S. Ladd did not in fact act for the estate of J. W. Ladd, but that the sale and transfer of three-fourths of the stock of the Oregon Steam Navigation Company was by Hayward, acting for all the stockholders, including himself, and was in pursuance of an understanding had in the lifetime of J. W. Ladd, and concurred in if not planned by him, by which the entire stock of the Oregon Steam Navigation Company was to be sold to the Northern Pacific Railroad Company, if such a sale could be effected upon favor-

able terms. It also appears beyond question and is in effect conceded by complainants, that all the proceeds of that sale have been fully accounted for to the estate of J. W. Ladd, and that the Hayward note for $190,000, was not a pretended note fraudulently substituted in the inventory of J. W. Ladd's estate by W. S. Ladd, to conceal from Mrs. Hiller the estate's ownership of the 7,600 shares of stock in Hayward's hands, but that J. W. Ladd, being in failing health, himself contrived the expedient of substituting Hayward's note for this stock, so that, in the event of his death, the stock might be held and the proposed sale had without recourse to the probate court, with the attendant publicity and possible complications, which would likely embarrass the pool in its proposed deal. By this contrivance, which was carried out, the note took the place of the stock in the inventory, and the avails of the stock were accounted for to the executors and credited as payments on the note. The explanation as to how these charges came to be made is that complainants were misled by the manner in which the accounts of Mrs. Hiller were kept by W. S. Ladd, and by the refusal of the executors of his estate to permit an inspection of the books of Ladd & Tilton, and were not apprised of the truth as to these matters until it was disclosed by the testimony taken in the case. There is no testimony tending to support the charge that W. S. Ladd, by threats or other means, induced Mrs. Hiller to execute the agreement relating to the construction of her husband's will, or that the trust instrument was because of his undue influence, or that he procured the decree of distribution of the assets of the estate, or that she was in any way subjected to his control. It is contended, however, that the sale and transfer by Hayward of the stock of the estate was illegal, because not authorized by an order of the probate court of the county of San Francisco, having probate of the will of J. W. Ladd, as required by the laws of California, and that W. S. Ladd, because of his relation as one of the executors of the estate, is liable to account for the value of the stock so illegally disposed of, and that this value is to be determined by the highest price for which this stock has subsequently been sold in the market. To this same end is the further complaint that Mrs. Hiller alone of all the owners of Oregon Steam Navigation stock was not allowed to come into the pool formed for the repurchase of this stock and to share in the profits of the sale made to Henry Villard in 1879, except as to the unsold 950 shares remaining at that time, her claim being that it was the duty of W. S. Ladd, as her trustee, to buy back said stock for her upon the same terms upon which he, with others, bought for themselves, as she alleges he could have done with her moneys and securities then in his hands. It is contended for complainant, Mrs. Hiller, that she did not know of the existence of the 7,600 shares in Hayward's hands, and that she was kept in ignorance of the fact, and of the sale of three-fourths of that stock to Jay Cooke by W. S. Ladd, whose duty it was to have apprised her of these matters, and to have prevented the sale to Jay Cooke unless the same was authorized by the court of probate of the county of San Francisco. The correspondence between W. S. Ladd, Mrs. Hiller, the complainant, Joe French, and Charles Tilton, then

of the firm of Ladd & Tilton, covering a period of many years, is in evidence, and is relied upon to prove that W. S. Ladd, Tilton, and French were acting in concert to keep from Mrs. Hiller all knowledge of this property. None of these letters refer in terms to this stock, and to this fact complainant attaches much importance. It is claimed in her behalf that the books of account kept for Mrs. Hiller by W. S. Ladd were obscure, and that the entries were so contrived as to conceal the truth as to this stock, and that to the same end W. S. Ladd mutilated these books by cutting out some of their leaves.

As to these matters the following facts appear: The Oregon Steam Navigation Company had a capital of $2,000,000, divided into 4,000 shares of $500 each. Later, and in November, 1868, this stock was increased to $5,000,000, divided into 50,000 shares of $100 each. In the meantime the Northern Pacific Railroad Company had been authorized, by an act of congress approved July 2, 1864, to build a branch of its road down the valley of the Columbia to a point near Portland, and, by joint resolution passed in December, 1869, congress authorized the construction of the main line of the road via the Columbia river to Puget Sound. It is probable that the increase of the capital stock of the Oregon Steam Navigation Company was with the view of a sale of that property to the Northern Pacific Railroad Company. The owners of the navigation company feared the effect upon their company of the construction of the railroad line, and took steps looking to a sale to the railroad about this time. The principal stockholders were J. C. Ainsworth, S. G. Reed, R. R. Thompson, W. S. and J. W. Ladd, Coe, Olmstead, Ruckle, and Bradford. In pursuance of a plan arranged between Ainsworth, Reed, Thompson, and the Ladds, it was given out that Alvinza Hayward of San Francisco, a capitalist of much wealth, was buying up the stock of the navigation company with the intention of controlling it, and a letter was written by Hayward to Ainsworth declaring this intention with suspicious bluntness. The holdings of those concerned were speedily transferred, with the exception of a few shares, necessary to qualify the directors to continue in office, to Hayward. Much, if not all, of this stock, being the new issue under the organization,—at least, that of J. W. Ladd,—was issued directly to Hayward by the company. Olmstead, Coe, Bradford, Ruckle, and other holders of stock, acting upon the assumption that Hayward had secured a majority of the stock, sold their holdings to him. There were thus issued to Hayward 48,125 of the 50,000 shares of the navigation company's stock, all of which belonged to the pool, including Hayward, who had 2,500 shares in his own right for the part taken by him in the deal. J. W. Ladd's interest in the pool comprised 7,600 shares. Hayward was the intimate friend of J. W. Ladd, and it is claimed, and is probably the fact, although of no particular importance, that the latter originated the scheme by which the pool acquired the entire stock of the navigation company. It is claimed that one of the objects of this transfer of stock was to facilitate the sale of the property, but the fact that it had the effect to transfer the stock of the other holders to the pool is a sufficient explanation of the object with which it was done. Neither party has any advantage over the other in re-

spect to this transaction, the morals of which are not involved in this suit. There is no doubt but that the stock of the Ladds was continued in Hayward's hands in trust, to be sold by him in the sale for which negotiations were pending. Such an arrangement, so far as the interest of J. W. Ladd was concerned, was important, in view of the precarious state of his health and the necessity of so placing the stock that the proposed sale would not be jeopardized by his death.

Another reason for this trust was suggested by complainant's counsel on the argument, and is supported by testimony in the case. The stockholders had been vexed by litigation, which is frequently referred to in correspondence in the case as the "blackmail suits." Some of this litigation grew out of the construction of a steamship, in which J. W. Ladd had an important part. The fear, and possibly the threat, of other suits made it desirable to these stockholders to conceal their interest in the company. There was a further motive for the course taken in the fact that Ben Holladay was threatening to establish an opposition line of boats. Hayward's relations to Holladay were understood to be of such a character as to remove all danger of opposition where Hayward was concerned. So that there were adequate motives for the transfer to Hayward and for the concealment thereafter in his name of the stock held in trust by him; and this explains the guarded character of the correspondence between the parties with reference to their stock. The letters from W. S. Ladd to Mrs. Hiller were not exceptional in this respect. All that passed between the other parties in interest had the same peculiarity. It is apparent that the writers of these letters were not trying to conceal anything from each other. It is probable that they were guarding against a possible future use of their correspondence as evidence of the real character of the Hayward deal. After a lapse of 25 years, and when all the participators in the transaction, except Hayward, Thompson, and Tilton, are dead, not an admission can be had from either of these except Tilton, who remembers but little. Hayward's memory is a total blank, and Thompson stoutly maintains in his testimony that he knows nothing about the pool, and does not know that Hayward held stock in trust; that the transfer was bona fide; and that the stock he subsequently took from Hayward was by actual purchase.

The removal of leaves from the books of account kept for Mrs. Hiller is explained by the witness Quackenbush. It was in keeping with the course of conduct pursued with reference to the stock of the Oregon Steam Navigation Company by the members of the pool in their correspondence. These books were originally opened by Quackenbush, who was cashier of the bank of Ladd & Tilton. The sale to Jay Cooke had taken place, and the proceeds of the sale were being collected by Tilton. It was not desirable to have it appear that the money received from Tilton for the estate came from the Oregon Steam Navigation stock, and the books as opened by Quackenbush would lead to this disclosure. So the account was changed to its present form, and three of the first leaves in the ledger kept for one of the parties, and four in the ledger kept for the other, were cut out

by Quackenbush. W. S. Ladd suggested the change in the form of the account, but had nothing to do with the removal of the leaves. Only two items of the account were changed. Quackenbush gives a transcript of the missing leaves, showing the account as it was originally entered. The stock and bonds appearing in the original account is in large part transformed in the altered account into an indebtedness due the estate from Charles Tilton. The assets of the estate were not in the least diminished by the change, which was merely one of form. The effect of the removal of these leaves from the two ledgers was of no consequence, except to those who might try to use these books to prove ownership of the stock in question in a proceeding to establish liability against such owners, or to set aside transfers induced by the device of the pretended Hayward sale. The mutilation of books of account is not a promising means of concealing the misappropriation of funds. It is not probable that W. S. Ladd would resort to such an expedient to conceal a fraud. Such an act on the part of a man of business shrewdness does not indicate a consciousness of wrong, but the reverse.

As to the point, urged in complainant's behalf, that the sale by Hayward of three-fourths of the stock held by him in trust for J. W. Ladd without an order of the probate court was illegal, and that W. S. Ladd, having permitted such a sale, is to be held as for a conversion of this stock, I am of the opinion that an order of the probate court was not necessary. This stock had been issued to Hayward, and he was its legal owner as trustee. No act of J. W. Ladd, if living, could add to the completeness of that title. If the right to revoke the trust existed, this "does not in any degree affect the title to the property. That passes to the donee, and remains vested for the purposes of the trust, notwithstanding the existence of a right to revoke it." Stone v. Hackett, 12 Gray, 227. The case of Huse v. Den, 85 Cal. 390, 24 Pac. 790, is cited in support of the contention that an order of the probate court authorizing this sale was necessary to its validity. That was a case where the executors of an estate undertook to sell it without the authority of the probate court. The court held that the will in that case gave no power to sell real property. Moreover, the deceased had in his lifetime executed a deed conveying the property to his brother and himself in trust for the benefit of the grantor's children. It was held that the intent of the grantor must govern, and that this deed was intended to be, and must have the effect of, a settlement for the benefit of such children. This intention was not affected by the will. The purchasers knew of the deed of trust and the provisions of the will, and of the want of power of the executors to sell without an order of the probate court, and purchased in the face of this knowledge. Of course, no title could pass under such a sale, nor could any equity arise in favor of the purchasers. In the case of In re Radovich's Estate, 74 Cal. 536, 16 Pac. 321, also cited by complainants, there was a sale of stock which came into the executor's hands without an order of the probate court, and the court held that there was a conversion, and that the executor was liable to the estate for the value of the stock with legal interest. In the present case the sale was by a trustee having the legal title.

Hayward was in law the owner of this stock. There was no limitation upon his power to sell. On the contrary, the stock was held by him for that express purpose. And this trust included the stock of other persons, by whose concurrent action the trust was created. The rights and interests of the several beneficiaries were mutual. Hayward had an interest, coupled with the trust. He was a beneficiary in the sale which he was authorized to make of the stock pooled in his hands, and therefore it was his right, as well as his duty, to sell. In the case of Bedell v. Scoggins (Cal.) 40 Pac. 954, the supreme court of California held that the payment of money to be expended in payment of the funeral expenses of the person making the payment, where the expenditure had been made in good faith, created a trust in the person to whom the payment was made, which was not extinguished by the death of the trustor. The court, in its opinion, referred to the fact that the probate court had not disapproved the payments made by the trustee. In that case the question was whether the trustee should be answerable for the money paid him by the trustor, and applied by him after her death as she had directed, and this question was decided in favor of the trustee. The principles of this decision apply in the case on trial. J. W. Ladd's intentions were to place the trust property beyond the reach of probate administration, and to secure the advantages of such a sale as his trustee and his own associates in the enterprise in which the property had been earned might approve and be able to make. In a letter to Tilton, of December 28, 1869, he says:

"I deem it prudent to arrange my little affairs, so if I should drop out it will not necessarily bring to light matters we desire to remain dark. If I can get you, William, and Hayward together a day or so, can arrange for any contingency."

It was, therefore, an important consideration with J. W. Ladd that his affairs should be so arranged that his death might not lead to a disclosure of matters that it was important to all the parties concerned should "remain dark." And this trust was carried out in good faith, precisely as the trustor intended, and it does not appear that the county court has ever disapproved what has been done.

But, if complainants' contention is conceded, that the death of J. W. Ladd revoked the power of Hayward as to said Ladd's stock, and thenceforth the control and disposition of this stock was in the executors of the estate, subject to the direction and control of the probate court, this in no wise affects the accounting for which this suit is brought. The recovery of this stock is not involved in this proceeding; but an accounting is sought for its value, and in this accounting complainants admit that they should be charged with the proceeds of the Hayward sale received by the estate. It is obvious that, in the matter of an accounting, the value of the property to be accounted for is not in the least affected by the question of legal formality or power of sale. That question could only be material where the value of the property or the price for which it was sold is claimed to have been affected by doubts as to the power of the trustee to make sale in the absence of authority by the county court; but this is not such a case.

The contention of the complainants is (1) that the sale in this case

80 F.—51

was unauthorized because the county court did not order it, and, being unauthorized, W. S. Ladd must be held as for a conversion, and the title of the estate allowed to attach to such shares of Oregon Steam Navigation stock as W. S. Ladd is found to have been possessed of at any time after the sale to an amount equal to what was sold by Hayward of the stock of the estate; or (2) that the value of the stock sold is to be determined by the highest price at which stock of this character was sold at any subsequent time. There is no relation whatever between these two propositions. They serve, however, the single purpose of enabling Mrs. Hiller to share in the profits of what is known as the "Villard deal,"—a deal which was had some seven years after the Hayward sale, and by means of which the stock of the Oregon Steam Navigation Company, sold by Hayward in April, 1872, at $40 per share, one-half in cash and the other half in bonds of the Northern Pacific Railroad Company, repurchased by the pool in the fall of 1875 at $15 and $13 per share, was sold by the pool to Villard in May, 1879, at $100 per share, one-half cash and the remainder in stocks and bonds. As already suggested, the standard by which the value of this stock is determined does not depend upon an order of the probate court. Upon an accounting, the only question is one of value. Has this stock been accounted for to the estate? To what is the estate entitled, in equity, that it has not received? It is not questioned but that the Hayward sale was a good one at the time. It was so regarded by the owners of the stock of the Oregon Steam Navigation Company, who spoke of it as a very desirable sale. It was made in good faith. The Oregon Steam Navigation Company's line was menaced at the time with the construction of the Northern Pacific road down the Columbia. The building of the railroad involved the destruction of the navigation company as a property. The owners of the stock in question, including J. W. Ladd, were apprehensive that their investments would become practically lost. They henceforth devoted themselves to the effort to sell their stock in a lump. All the facts in evidence tend to show that the pool acted with prudence, and that the sale was in fact "a desirable one." Under the conditions as they existed, the sale realized the value of the stock sold. It was a matter of regret to the members of the pool that the purchaser refused to take more than three-fourths of the stock offered. No question is made as to the fact that the Hayward sale realized the full value of the stock at the time, and the testimony shows beyond question that the sale was in pursuance of the plans formed in the lifetime of J. W. Ladd, and to which he was a party.

But there are other considerations in the way of any relief to the complainant. Upon the contention that W. S. Ladd should have prevented the sale by Hayward, in his capacity of executor or trustee for Mrs. Hiller, or both, the fact appears that the part taken by W. S. Ladd in the execution of the will of J. W. Ladd was merely perfunctory. He was residing in Portland. Mrs. Hiller and Joseph French, two of the three executors, resided in San Francisco. They were active in the administration of the estate. The lawyer engaged to act as legal adviser was E. E. Haft, who had been the legal ad-

viser of J. W. Ladd. But it is urged in Mrs. Hiller's behalf that she was weak, inexperienced in business, confiding in others, and especially in W. S. Ladd, and was ignorant of her husband's ownership of the stock in question. It does not appear, however, that her ignorance, if she was ignorant, is attributable to W. S. Ladd, or that he knew of it. It does appear, from the testimony of Charles Tilton, that several months before the sale was finally made, and while it was in contemplation, she discussed it with Tilton, and said it would increase the value of her half of the estate. In a letter written to W. S. Ladd on June 4, 1872, just before her departure for Europe, she says, "I am much pleased with the late sales, and to have things settled up before going away." There was no other sale or transaction to which this letter could refer than the one in question, and she attempts no explanation of these statements. It is shown that she knew in her husband's lifetime that he owned this stock. In the summer of 1870, J. W. Ladd and his wife, the complainant, were in Denver, where they had gone in consequence of the former's failing health. On the 13th of June, complainant wrote a letter to Charles Tilton entreating him to come to Denver and go back with them to San Francisco. J. W. Ladd's health was failing, and he was despondent and homesick, and his wife was anxious to have some one there whose presence would "cheer him." Tilton thereupon went to Denver, and accompanied J. W. Ladd and complainant to San Francisco, and he testifies that on that occasion he told both J. W. Ladd and complainant of Ainsworth's failure to make the sale of Navigation stock (the first negotiations for the sale of the stock of the pool were conducted by Ainsworth, and were unsuccessful); that they understood it fully, and were both very much disappointed. There is no contradiction of this testimony, and it is very natural that these three persons should, under the circumstances, have discussed matters of business in which they were all deeply concerned. Tilton also testifies that, after the death of J. W. Ladd, the complainant Mrs. Hiller came East, in April, 1871, and remained there a month or two. During this time, Tilton saw her quite often. He testifies that she spoke of her stock. Both were interested in the subject. She inquired of him what he thought she could get for it. There is other testimony showing knowledge of this stock on Mrs. Hiller's part. In a letter by W. S. Ladd, written in March, 1871, to Tilton, he speaks of the Hayward note for $190,000, and says it will all be arranged; that his brother (J. W.) talked to both himself and "Sadie" (Mrs. Hiller) about it. None of this testimony is contradicted by Mrs. Hiller. She was particularly examined as to this knowledge on her part, and testified as follows:

"Q. In this forecast of death,—this gradual approaching death of your husband,—did he not discuss with you the fact, and how you were to be left, and what would be your means of livelihood? A. It would be natural for him to. Q. Yes, I think it would be natural. But the fact is, did he? A. Well, I could not give any exact words, or anything of that sort, but I would not say that he did not, because it is more than probable that he did. Q. You had no particular property when you married him, had you? A. No, sir. Q. Then did he not give you some idea in what his wealth or income-making property consisted? A. Yes, sir. I think he did; but I could not tell you now."

In the correspondence between W. S. Ladd and complainant appear statements that imply a knowledge of the matters in question on Mrs. Hiller's part. In one of these letters, written by W. S. Ladd to Mrs. Hiller, on May 27, 1872, the writer says:

"The interest on your half of the bonds will be some $4,577.10. What may be realized from the balance cannot now say, but, as before stated, I will advise you when can do so."

There was not a single bond of any kind in the inventory of the estate, and there were no bonds to which this letter could refer other than those derived from the Hayward sale, the proceeds of which were covered by the $190,000 Hayward note. That note was inventoried as an asset of the estate, and was in lieu of the proceeds of that sale, of which these bonds were a part, as it had been of the stock in Hayward's hands before the sale. Unless Mrs. Hiller understood this, the reference in this letter to her half "of the bonds" would have been inexplicable. The language of this letter implies an understanding between the parties as to these bonds, and it cannot be reconciled with any theory of deception upon the part of one of the parties or of ignorance upon the part of the other.

There is testimony, as has been seen, tending to show that among the reasons for the transfer of stock of the Oregon Steam Navigation Company to Hayward by Ainsworth, Thompson, Reed, and the two Ladds, was the desire to conceal the interest of these owners, and thus avoid, or make it easier to compromise, liability in certain pending or threatened litigation, and that these matters were, in fact, compromised by payments for which the different owners of stock were assessed. As to these matters, Mrs. Hiller testifies that she presumes she was familiar with them at the time, and in one of her answers, she says: "Yes, sir. I have heard of O. S. N. stock, and of those sorts of things before." When asked if she did not know at the time of the Northern Pacific sale—or what is known as the "Jay Cooke deal"—that she had some of the O. S. N. stock, or an interest in some, she answered: "Well, I presume I knew at that time. My letters will show." Later in her testimony she says she cannot tell whether she knew that certain bonds of the Northern Pacific Railroad Company, which she thinks or presumes she had, came from the sale of Oregon Steam Navigation Company stock; that she is not sure that she did not know, and has no impression on the subject; that she supposes she had a talk with Mr. Tilton about it, but don't know as to that. If this testimony, taken as a whole, is given a construction most favorable to Mrs. Hiller, it amounts to a denial of any recollection as to whether or not she knew of the ownership of this stock by her husband's estate at the time the estate was being settled up in 1872. When she is asked the question as to such knowledge, she answers, "I could not tell you, now, whether I knew it then or not." If there was nothing to show that she had knowledge, her inability to say that she was without it would preclude relief to her upon the ground of ignorance. In other words, she cannot recover on the ground of ignorance unless she was ignorant, and, if she does not know that she was ignorant, no one else can know it. The court cannot find that she was ignorant against

her own denial of any recollection on the subject; and when, in another part of her testimony, she says that she thinks it more than probable that her husband, when his death was impending, discussed his business affairs with her, and that she thinks he gave her an idea of what his income-paying property consisted, the conclusion that she knew of the existence of this stock and that Hayward held it for her husband, and that as one of the executors of her husband's estate she acquiesced in its sale, becomes irresistible. This testimony supplements that of her letter to W. S. Ladd expressing her satisfaction at the late sales, and the opportunity thus afforded for a settlement of her husband's estate, and it corroborates the testimony of Tilton and of members of W. S. Ladd's family, who testified in the case, to statements by Mrs. Hiller, showing her knowledge, although corroboration, in the absence of contradiction, is not necessary.

It is true that, after the 15th of May, 1872, W. S. Ladd was invested by her deed with a trust to manage her affairs for her; but this trust did not involve an assumption by him of the responsibility devolving upon Mrs. Hiller as executor of her husband's estate. She and French were active in the administration of the estate prior to her departure for Europe. She controlled the selection of an attorney for the estate, and declined to permit the employment of Gen. Barnes, because she thought his charges would be too great. The inventory of the estate was made and filed before W. S. Ladd qualified as executor, and it included the Hayward note for $190,000, given by Hayward to J. W. Ladd as a cover for the latter's stock, as one of the assets of the estate. These were her acts jointly with French. W. S. Ladd was in the meantime in Portland, and, so far as appears, did not attempt to control or influence the action of the San Francisco executors. As to this ground of her complaint, Mrs. Hiller is in the attitude of trying to recover from the representatives of W. S. Ladd, because he did not prevent the execution of a trust created by her husband, although what was done was of advantage to her husband's estate, and was to her interest, and was with her acquiescence. If the death of J. W. Ladd revoked the trust in Hayward, and subjected the shares in his hands to administration in the probate court, so that the sale subsequently made without an order of the probate court was illegal, then it is Hayward who is liable. If the liability results as a matter of law from the acts of Hayward, he, and not W. S. Ladd, must account. Why has no claim been preferred against him? Why should W. S. Ladd's representatives be proceeded against, because he, with the complainant and French, permitted Hayward to sell this property, while the party whose act furnishes the ground of complaint is not called to account?

Upon the sale to Villard in 1879 of the 950 shares of Oregon Steam Navigation stock belonging to the estate of J. W. Ladd, these shares being Mrs. Hiller's half of the unsold one-fourth of the 7,600 shares in Hayward's hands after the Jay Cooke sale, W. S. Ladd represented to Mrs. Hiller that these shares realized $50 per share, and no more. He concealed from her the fact that she was entitled to

an additional $50 per share of the stock sold in stocks and bonds. Mrs. Hiller became acquainted with this deception in January, 1880, and requested W. S. Ladd to forward these stocks and bonds to her. This he did, with a frank acknowledgment that he had not disclosed to her the full consideration received for the stock sold, and an explanation of the motive for his conduct. A great deal of importance is attached to this feature of the case by the complainant, although the matters involved were settled more than 13 years ago, and no charge is now made in respect to them, except that this deception shows a purpose on the part of W. S. Ladd to defraud complainant in the management of her affairs. The explanation which W. S. Ladd gave to the complainant for withholding from her the full consideration for which her bonds were sold is contained in his letter to her of February, 1880. In that letter he says:

"An inspection of your account renders any remarks concerning the management of your affairs wholly unnecessary. At the same time, such inspection will disclose the motive which actuated me in reporting to you only the cash transaction in the sale of the O. S. N. Co. stock. You have drawn $151,645.18 (one hundred and fifty-one thousand six hundred and forty-five and eighteen one-hundredths dollars), in addition to the allowance by the probate court during the years 1871–1872 of $8,500 (eighty-five hundred dollars),—some $160,145.-18,—and the investments made by you so far as I have any knowledge do not exceed $25,000 (twenty-five thousand dollars). I therefore conclude that, should you become apprised of the full avails realized upon the sale referred to, it would serve to stimulate the extravagances against which I have heretofore taken pains to caution you. To prevent any complications in the event of death, I had taken the precaution of placing the bonds and stock in a package, indicating thereon the interest I had therein as your attorney, as trustee for legatees, and personally. Besides, your books would have disclosed the true condition of your affairs. The trouble you seem to have taken to ascertain the terms of sale were wholly unnecessary, as they are familiar to nearly every business man in this city."

The truth of the statements contained in this letter is not denied. Mrs. Hiller's fortune was being rapidly dissipated. She was conscious of her weakness in this respect, and was at times extremely penitent on account of it. In a letter written June 16, 1875, to W. S. Ladd, she says:

"With regard to the $81,239, I have lived and invested the best I knew how under all the circumstances, and if I have learned, like hundreds of others, to shun stocks as a 'pestilence or a ravening death,' why, I have no one but myself to blame for any foolish act of mine. In looking back upon my whims and its consequences, I can wring my own hands in my own little anguish, and exclaim, wonderingly, all to my little self (when too late), 'Who'd a thought it!' Never mind! I can console myself with the fact that but very few philosophers, even, have enough common sense, or honesty, either, to last them over night, seeing that they preach a great deal more good than they practice."

Nearly four years later, in a letter written March 28, 1879, to W. S. Ladd, she says:

"No person realizes the error of my ways more keenly than does my individual self."

And further on she adds:

"But wait a little longer, William. It may not all be lost. Meanwhile I will earnestly hope to escape out of the only loophole that is at present my salvation in financial affairs. If it is ruled otherwise, you will not be apt to hear any murmur from me about it. While, on the other hand, should there be

a favorable issue, I should only be too happy to report, and rest assured there is no one living whose approbation I should feel prouder to earn than yours. This is truly the feeling I have in my heart of hearts."

She was wasteful of her money in other ways than in the purchase of stocks. When she went abroad she took a valet with her, and within a short time she lost $2,000 in a bank failure. On this trip she loaned $2,000 to a French doctor, who was a casual acquaintance, and lost it. At the same time she expended $2,000 for laces, and was talking of keeping a carriage. She described herself as "a gay widow" and an "extravagant piece." Tilton wrote to her that she would soon be at the "end of her pile." These extravagances were the subject of comments in the correspondence between W. S. Ladd, Tilton, and French. Even after her marriage, it was suggested in the letters between Ladd and Tilton that they would yet have her to support. Upon her return from Europe in 1874, Tilton suggested to W. S. Ladd, so he testifies, that he should "cover" some of her property, because, if he did not, he would have her on his hands to support. The fact is suggestive that, notwithstanding her statement in her letter to W. S. Ladd of June 16, 1875, that she had learned to shun stocks as a pestilence or ravening death, yet, in her letter of March 28, 1879, she unmistakably indicates that she has again gone into the whirlpool of stock gambling as the only "loophole" of "salvation" in her "financial affairs," and that this was upon the eve of the Villard sale. The suggestion of Tilton to "cover" something for her would have especial weight in this state of affairs, and the Villard sale seemed to offer the last opportunity to save something, for at least the present, out of the wreck of her fortune. It is not disputed that she had, as stated in the letter of W. S. Ladd, expended above $160,000. It was hers to spend, but if he intended to withhold from her a remnant of her estate, while she was in the act of throwing dice, however temporary the effect might be, she cannot complain. The statement in his letter that nearly every business man in the city was familiar with the terms of the Villard deal, is probably true. Certainly the terms of that deal were not confined to a few persons. They were known to all the members of the pool on the one side, and to all those interested with Villard on the other. The street knew all about the Villard deal, and it was not possible that the complainant and her husband could very long be ignorant of it, or that W. S. Ladd could have supposed so. The books kept for Mrs. Hiller and for Ladd himself disclosed it. So did the books of Ladd & Tilton. Quackenbush, the cashier of Ladd & Tilton, testifies that he remembers distinctly the receipt of the stock and bonds that belonged to Mrs. Hiller, and that they were placed in an envelope, and put in the tin box where Mrs. Hiller's papers were kept, and marked "W. S. Ladd, Trustee." He knew to whom they belonged. W. S. Ladd wrote to Tilton, saying that, if anything should happen to him (Ladd), Tilton would always find the tin trunk in Ladd's safe, containing Mrs. Hiller's matters, and he requested Tilton in such an event to go to Quackenbush and get the key and attend to it himself. All this was arranged with the thoughtfulness of a prudent business man. The evidence of the ownership of Mrs.

Hiller of these stocks and bonds was thus carefully provided, and such instructions given as to avoid the possibility of mistake, and prevent any confusion of this trust property with his own. As stated in his own letters to Tilton, written with evident sincerity, and in the confidence that existed between them, he was doing for his brother's widow what he should have expected his brother to do for his own. There is much evidence bearing conclusively upon the question of the good faith of W. S. Ladd, but the matter is left so free from doubt upon the facts already considered that further comment is unnecessary.

The contention that it was the duty of W. S. Ladd to take complainant into the repurchase pool, which led to the Villard deal, shows, after all, the end sought in the suit. It is to this end that the claim was made that none of the stock of J. W. Ladd had in fact been sold to Jay Cooke. In this way it was sought to trace this stock in the subsequent sale to Villard. So, too, of the claim that, in any event, W. S. Ladd, having funds, as is claimed, belonging to J. W. Ladd's estate in his hands, available for that purpose, it was his duty to have preserved an interest in the repurchase scheme for the estate. It does not appear, however, that there were funds of the estate in the hands of W. S. Ladd available for any such purpose. If there were such, it does not follow that W. S. Ladd should have employed them in this way. Nor does it appear that W. S. Ladd in any way controlled the repurchase pool, or that he could have secured an interest for the estate, unless he devoted his own interest to that object. There was no obligation upon him to take the estate into the pool, if he could have done so. He may as well have been expected to share in all his other investments with the estate. There was no connection between the sale to Jay Cooke and the repurchase and sale to Villard. There was an interval of years between the two. Wright and Villard were both interested in the latter, and had nothing to do with the former, while Hayward, who was a member of the first pool, was not concerned with the second. The question as to who should comprise the pool could not, in the nature of things, be determined by one member. It was a matter for all concerned, and only those were included who could serve their joint interests.

The court is asked to decree against the writing by which Mrs. Hiller agreed to a construction of her husband's will by which she received but one-half of the entire estate, instead of three-fourths. Since by the laws of California she was entitled to one-half as community property, without the will, it is contended that, under the will, she should have one-half of the remaining half. This agreement was executed in May, 1872, and final distribution of the estate was had by order of the probate court of San Francisco in September of that year. If this decree of distribution is not final, still this court has no jurisdiction. It is a matter exclusively of probate jurisdiction, over which no court of equity has cognizance. This is settled by a long line of cases, including the case of In re Broderick's Will, 21 Wall. 503. The agreement was in effect a stipulation for the action of the probate court in making its decree. It is merely

the means to the proceedings that have taken place, and neither those proceedings nor the subject to which they relate are cognizable here. And, besides this, in a matter within the equity jurisdiction, this court would still be bound by the decree of distribution that has been made. It certainly will not be contended that this court can cancel, set aside, or modify the decree of distribution made by the probate court of San Francisco. No more can it compel an account for what has been received under that distribution, for that would be to annul the decree of probate by indirection, and make a decree of distribution of its own. I am of the opinion that the claim made at this late day as to the agreement by which the will was construed is merely to reinforce the other grounds of complaint. Mrs. Hiller cannot and does not pretend ignorance for more than 20 years of the agreement of May 16, 1872, and of what was done in pursuance thereof. Furthermore, I am of opinion that she knew what her husband's wishes were in respect to a division of this property. In July, 1871, she discussed with Tilton the proposed sale of stock, and said it would increase the value of her half of the estate. If it was then in her mind that she was the owner of three-fourths of the entire estate,—one-half as her community share, and half of the remaining half as legatee,—it is not probable that she would have expressed herself in this way. The proposed sale would have benefited her community half in equal proportion with the other, and it amounted to twice as much in value. In the will the words "one-half my estate" were used, in my opinion, in their general acceptation, by which is included the entire property accumulated, managed, and used as a single property by the deceased. It is said that by such an interpretation, Mrs. Hiller takes nothing under the will; but the will gives to the community property the separate property of the husband owned by him at the time of the marriage. How much that was does not appear; but it was assumed in the case that the husband was possessed of property at that time, while the wife had none. But, whatever the fact may be as to this, the other objections to the relief sought as to the distribution that has been made are conclusive.

The question of limitation of Mrs. Hiller's right of suit by reason of her delay in bringing it is not considered. But her delay, under the circumstances, affects the question of her good faith. The facts upon which she bases her claim for relief were known to her for more than 20 years before this suit was begun. She knew that her husband owned the 7,600 shares of Oregon Steam Navigation Stock in Hayward's possession, and the object of that trust. She not only knew of the proposed sale, but she kept informed of the progress of the negotiations in respect to it. She was disappointed when Ainsworth failed to make the sale in her husband's lifetime, and in May, 1872, was pleased that the sale had been effected. She was an intimate friend of Hayward's, and, as one of the executors of her husband's estate, knew that the inventory, prepared and filed by herself and French, before W. S. Ladd qualified as executor, included a note of Hayward's for $190,000. Hayward could not have forgotten that note, nor have been ignorant of the fact that it ap-

peared as an asset of his dead friend's estate. It is incredible that this note was regarded by both Hayward and Mrs. Hiller as a matter so usual or inconsequential as not to be mentioned, if not discussed, between them, and that Hayward has forgotten whether he knew of it and cannot recollect what it was for. There was probably never a case where so much was forgotten. The reasons for the suit are easily understood. Thirteen years before it was begun, the complainant, then a widow, was urged to a like course by the witness Alexander, who was anxious to marry a cause of action of such uncommon magnitude, and who employed a lawyer and had a complaint drawn for her signature; but complainant at last refused to embark in the enterprise planned for her. With the death of W. S. Ladd, the most formidable obstacle in the way of such a suit was removed. It may have seemed reasonable to complainant's husband, by whom, according to the testimony of Van Bokkelin, the expert accountant who testified for complainant, the suit was "instigated," that out of the abundant estate of W. S. Ladd some repairs should be made of the business misfortunes of J. W. Ladd's widow,—that she should have some profit out of the Villard deal. Her first husband was a pioneer in this particular field. Complainant and her husband, nominally a complainant himself, may have suspected that the prosperity of W. S. Ladd was in part at their expense, and that he had secured an interest in the Villard deal on account of his brother's estate, and kept it himself. The same witness testifies that it was the discovery about "the repurchase pool matter" and the division of Oregon Steam Navigation Company stock into six interests that started this investigation. Hayward, not being in the repurchase, the existence of a sixth interest suggested that an interest had been taken for the estate with those of Thompson, Reed, Ainsworth, Tilton, and W. S. Ladd. Wright's interest was not suspected. Villard's interest was not disclosed. In this way the investigation started with the belief that the then unexplained sixth interest in the repurchase pool belonged to the estate of J. W. Ladd.

The other grounds of complaint are later developments to the end of securing an interest in the Villard sale, upon the theory that none of the 7,600 shares in Hayward's hands were actually sold to Jay Cooke; or, if they were so sold, that W. S. Ladd, after the Jay Cooke failure and when the stocks and bonds comprising a part of the price of sale became worthless, fraudulently substituted his own stock for that of J. W. Ladd's estate, so that the estate's stock, after all, remained, and went in the Villard sale; or, if those shares were sold and delivered by Hayward to Jay Cooke, that the sale, being unauthorized by the probate court, was illegal, and, W. S. Ladd not having prevented it, the title of the estate attached to the shares in the hands of W. S. Ladd, or to those afterwards purchased by him in the repurchase,—so that, upon any one of these theories, complainant continued the owner of three-fourths, or at least of one-half, of 7,600 shares of Oregon Steam Navigation stock, and is entitled to follow it into the Villard sale, and thus share in the profits of that sale, or, on failure of these various theories, that she is still entitled in equity to a share in the Villard sale, upon the ground that W.

S. Ladd ought to have secured her an interest in the repurchase pool. This combination of diverse and groundless complaints is probably due to the fact that the expert witness, Van Bokkelin, had, as he himself testifies, a contingent interest in the result; and I think it my duty to add in this connection that the spectacle of a witness testifying for an interest in the recovery which his testimony is relied upon to secure is an unusual one, and it is to be hoped that it will remain so.

Upon the facts appearing in this case, the respondents are entitled to a decree in their favor that the bill of complaint be dismissed, and it is so ordered.